UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

PENNY HAMMONDS,             )
                            )
        Plaintiff,          )
                            )    No. 2:10-cv-121
v.                          )
                            )    *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,  )
                            )
        Defendant.          )

**REPORT AND RECOMMENDATION**

Plaintiff Penny Hammonds ("Plaintiff") was denied supplemental security income ("SSI") by the Commissioner of Social Security ("Commissioner" or "Defendant"), and she now appeals the Commissioner's decision.[1] Plaintiff has moved for summary judgment, contending that the Administrative Law Judge ("ALJ") who heard her claim erred in finding she could perform a limited range of medium work [Doc. 9]. For the reasons stated below, I **RECOMMEND** that Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**; Commissioner's cross motion for summary judgment [Doc. 13] be **GRANTED**; the decision of Commissioner be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

**I.    ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for SSI on January 29, 2008, alleging disability due to depression and diabetes since January 9, 2008 (Tr. 88, 101). Plaintiff's claim was denied initially and upon reconsideration (Tr. 40-49). After a hearing held September 22, 2009 (Tr. 19-31), the ALJ found Plaintiff was not disabled because she had the residual functional capacity ("RFC") to perform

---

[1] This action is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), which together provide for judicial review of the final decision of the Commissioner denying SSI benefits.

medium work, further limited to "repetitive simple jobs" and "occasional[] interact[ion] with people" (Tr. 11-14). The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3). This matter is now ripe for judicial review.

## II. DISABILITY DETERMINATION PROCESS

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps to show the extent of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). In order to make the required findings at steps four and five, the ALJ must assess the claimant's RFC, which refers to the maximum level of work the claimant can perform on a "regular and continuing basis"—i.e., for 8

2

hours per day, five days per week.  Social Security Ruling ("SSR") 96-8p.

## III. FACTUAL BACKGROUND AND ALJ'S FINDINGS

### A. Plaintiff's Application for Benefits and Hearing Testimony

Plaintiff attended school through the eleventh grade and has her GED (Tr. 22, 108). She has worked only sporadically in the past, and not at all since 1997 (Tr. 22, 121, 212). As noted above, she alleged disability due to mental illness and diabetes.

With respect to her alleged mental impairments, Plaintiff stated that her depression made it difficult for her to even get out of bed (Tr. 101). During an interview conducted during the application process, it was noted that her affect was "very flat," although she had no problems communicating and her recall was above average (Tr. 112). Plaintiff testified she lacked the "energy or interest to do anything" (Tr. 23). She also claimed she could not concentrate and had crying spells (Tr. 23). She alleged she experienced panic attacks three or four times per week (Tr. 25). Plaintiff had been medicated for depression, but at the time of the hearing had not been taking her medication for several months, allegedly because she could no longer afford it (Tr. 23-24).

With respect to her claimed physical impairments, Plaintiff stated that her diabetes had caused "neuropathy in both hands and both feet" and she had trouble standing, but she did not allege any difficulty walking (Tr. 23, 127). She was taking insulin, which she received from the health department (Tr. 24).

### B. Medical Evidence Before the ALJ

#### 1. Mental Health Treatment and Opinion Evidence

The earliest records of Plaintiff's psychiatric care are dated in mid 2005, when Plaintiff was treated by Ronald S. Smith, M.D., for depression and anxiety (201-09). Between April 2005 and

3

December 2005, Plaintiff's symptoms of depression fluctuated from "euthymic" to "severe," and her anxiety ranged from "not evident" to "moderate" (Tr. 203-09). On November 1, 2005, Plaintiff was severely depressed, tearful, and reported auditory hallucinations and suicidal ideation (Tr. 204). Because she "endors[ed] suicidal ideation, with a plan to shoot herself," Plaintiff was admitted to Indian Path Pavilion for treatment (Tr. 185).[2] It was noted that Plaintiff's depression had been "well maintained" on her outpatient medications, but she had not been able to afford the co-pay on her medications, and had been feeling very depressed for about three weeks (Tr. 185). Her global assessment of functioning score ("GAF") was 29 at admission, but she responded well to her medications and her GAF had improved to 40 on discharge (Tr. 185, 190).[3] On November 9, 2005, Plaintiff returned to see Dr. Smith with mild to moderate symptoms of depression (Tr. 203). She stated that her mother was helping her pay for her medications (Tr. 203).

In January 2006, Plaintiff received a consultative mental health evaluation in connection with a prior disability claim (Tr. 211-14). Steven Lawhon, Psy.D., did not conduct psychological testing, but did perform a mental status examination and clinical interview (Tr. 211, 213). Dr. Lawhon stated he could not rule out a thought disorder, and he estimated Plaintiff was functioning in the low average range of intelligence (Tr. 212). He recorded Plaintiff's self-reported daily activities: napping, cooking, washing dishes, eating out, shopping (at night, to avoid other people), and

---

[2] Plaintiff had been admitted at Indian Path twice previously, but details of those admissions are not in the record (Tr. 188).

[3] A GAF score between 31 and 40 indicates either "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood" (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

watching television (Tr. 213). Dr. Lawhon opined that Plaintiff was not significantly limited in social interaction or her ability to understand and remember, but she was moderately limited in work adaptation and her ability to sustain concentration, persistence, and pace (Tr. 213-14).

In September 2007, after being referred by Suzanne Toyne, M.D., her primary care physician, Plaintiff began treatment at Frontier Health (Tr. 215-27). Plaintiff's mother died in May 2007, and Plaintiff reported increased depression and panic as a result (Tr. 215). In November 2007, Plaintiff's mood was "somewhat depressed," but her affect was friendly, her speech was normal, her perception was clear, her thought associations were intact, and her thinking was organized (Tr. 215). Plaintiff continued to report auditory hallucinations, but they had decreased in January 2008 (Tr. 217, 219). In March 2008, Plaintiff's condition took a turn for the worse. She was depressed and angry, with decreased sleep and appetite and frequent crying (Tr. 221). It was questioned whether she had been compliant with her medications (Tr. 221). The following month, however, Plaintiff's mood was euthymic and her affect was pleasant (Tr. 223). A treatment note dated July 2008 recorded Plaintiff's mood as depressed, with congruent affect (Tr. 263). During her treatment at Frontier Health, Plaintiff's GAF ranged from 50 to 55 (Tr. 216, 226).[4]

In May 2008, reviewing consultant William Meneese, Ph.D., found that Plaintiff suffered from depression with a history of schizophrenia and a panic disorder (Tr. 249-52). He opined that she was mildly limited in activities of daily living, and noted that Plaintiff "independently care[d] for most needs (Tr. 256, 258). With respect to social function and maintaining concentration, persistence, and pace, Dr. Meneese opined Plaintiff was moderately limited (Tr. 256). Dr. Meneese

---

[4] A GAF between 51 and 60 indicates "moderate" symptoms such as flat affect and circumstantial speech or occasional panic attacks or moderate difficulty in social, occupational, or school functioning. *Nowlen*, 277 F. Supp. 2d at 726.

also remarked that Plaintiff had experienced one or two episodes of decompensation (Tr. 256). Based on Plaintiff's activities of daily living and her treating physician's notes, Dr. Meneese opined that Plaintiff did not have the signs and symptoms of a markedly disabling mental illness (Tr. 258). The same day, Plaintiff's claim for benefits was denied (Tr. 42). In November 2008, after Plaintiff requested reconsideration, reviewing consultant Larry Welch, Ed.D., opined that Plaintiff's condition had not changed, except for "some stress over [her claim's] denial (Tr. 280). Like Dr. Meneese, Dr. Welch opined Plaintiff was mildly limited in activities of daily living and moderately limited in social functioning and concentration, persistence, and pace (Tr. 278). Unlike Dr. Meneese, however, Dr. Welch remarked that Plaintiff had not suffered from any episodes of decompensation (Tr. 278). Yet another reviewing consultant, Richard Gann, M.D., opined that he agreed with Dr. Welch's assessment (Tr. 288).

In December 2008, Plaintiff reported she had discontinued her mental health medications because of her diabetes, but she did not state whether she had done so at a doctor's recommendation (Tr. 282). At that time, her affect was flat, but she was able to follow instructions (Tr. 282). In October 2009, Plaintiff returned to Frontier Health for treatment (Tr. 340-42). She reported daily crying spells, difficulty finishing anything she started, forgetfulness, and a lack of motivation (Tr. 340). Plaintiff was assigned a GAF of 49 (Tr. 391).[5] It was noted that Plaintiff had a history of noncompliance with her medications and was suffering from financial stressors (Tr. 341-42).

### 2. Physical Health Treatment and Opinion Evidence

Plaintiff has Type II diabetes, which in October 2005 was noted to be "[u]ncomplicated,

---

[5] A GAF between 41 and 50 indicates "serious" symptoms such as suicidal ideation or serious impairment in social, occupational, or school functioning. *Nowlen*, 277 F. Supp. 2d at 726.

6

[u]ncontrolled, [and] [s]table" (Tr. 158). In November 2005, while receiving mental health treatment, Plaintiff denied any sensory loss or muscular weakness (Tr. 188). In April 2008, Plaintiff's diabetes was "poorly controlled," and she reported that her blood sugar levels were "all over the place" (Tr. 239). In May 2008, reviewing consultant Stephen Burge, M.D., agreed that Plaintiff's diabetes was poorly controlled (Tr. 246-47).[6] Nonetheless, Dr. Burge opined that the medical reports were inconsistent with Plaintiff's allegations of disability, which included difficulty lifting, bending, standing, and kneeling (Tr. 246).

Plaintiff was examined by Kirish Purswani, M.D., in December 2008 (Tr. 282-83). Plaintiff complained that her legs and feet felt numb and ached (Tr. 282). She reported that she checked her blood sugar regularly and had lost 87 pounds (Tr. 282). At 248 pounds, Plaintiff was still obese, but her gait and station were normal; she did not use an assistive device; and she was able to climb on and off the examination table without help (Tr. 282). Dr. Purswani diagnosed diabetes, hypothyroidism, and obesity, but did not offer an opinion regarding Plaintiff's functional limitations (Tr. 283). Later the same month, however, Nathaniel Robinson, M.D., reviewed the results of Dr. Purswani's examination and opined that Plaintiff did not suffer from any severe physical impairments (Tr. 284-87). Dr. Robinson noted Plaintiff's history of diabetes, thyroid problems, and hypertension, but concluded that there were no disabling complications associated with Plaintiff's conditions (Tr. 287).

The records of Plaintiff's diabetes treatment continue through December 2009 (Tr. 294-306, 328-37), and they show that Plaintiff had difficulty paying for her insulin on at least one occasion (Tr. 299). Plaintiff also sought emergency care on several occasions. In July 2008, she complained

---

[6] He also noted that Plaintiff had been treated for hypothyroidism and hypertension (Tr. 246).

of headache, but a CT scan was normal (Tr. 307-09). A year later, she sought treatment after losing consciousness and falling, apparently due to hyperglycemia (Tr. 310-13). Finally, in October 2009, Plaintiff was treated for a groin abscess and nausea, and she was diagnosed with diabetic ketoacidosis due to the infection and insulin noncompliance (Tr. 318). Plaintiff admitted she had not taken her insulin for three days (Tr. 316). At that time, she was receiving insulin from the county health department, but simply had not refilled her prescription (Tr. 316).

### C. ALJ's Findings and Vocational Expert Testimony

After the hearing, the ALJ issued a decision finding Plaintiff had not been disabled during the time period she alleged (Tr. 8-14). At step one, the ALJ found Plaintiff had not been engaged in substantial gainful activity since January 9, 2008, the alleged onset date (Tr. 10). At step two, the ALJ found Plaintiff had several severe impairments: type II diabetes, hypertension, obesity, and depressive disorder (Tr. 10). At step three, however, the ALJ found that none of these impairments, either singly of in combination, met the requirements of any presumptively disabling impairment (Tr. 10). Between steps three and four, the ALJ found Plaintiff retained the RFC to perform medium work, but only with repetitive, simple jobs and no more than occasional interaction with people (Tr. 11).

At the hearing, the Vocational Expert ("VE") testified that Plaintiff had no past relevant work, but offered testimony about other jobs that someone with Plaintiff's age, education, and experience might be able to perform. The ALJ asked the VE to assume that Plaintiff could perform only simple, routine, and repetitive jobs and that she was better with things than with people (Tr. 28-30). If she could perform work with "medium" exertional requirements, the VE testified that she could work as a hand packer and packager, material mover, production worker, vehicle cleaner, or

8

dry cleaning worker (Tr. 29). The VE also testified that those same sorts of jobs were available for someone who could perform only "light" work (Tr. 29). Even if Plaintiff could perform only sedentary work, the VE testified there were between 4,000 and 5,000 jobs within her capability (Tr. 30). If, however, Plaintiff's testimony were taken as entirely credible, the VE opined Plaintiff would be unable to perform any of these jobs (Tr. 30). Based on the RFC finding and the VE's testimony, the ALJ found that Plaintiff could perform work existing in significant numbers in the national economy and was therefore not disabled (Tr. 13-14).

## IV. ANALYSIS

In this appeal, Plaintiff challenges the ALJ's assessment of her RFC, arguing chiefly that the RFC should have been formulated by a physician, not the ALJ.

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve

9

conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). The court may, however, consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### B. Substantial Evidence

According to Plaintiff, the medical evidence demonstrates that her limitations are of greater severity than is reflected in the ALJ's RFC assessment. Plaintiff argues chiefly that the RFC finding was error because it "was not formulated by a physician, but by the ALJ." [Doc. 10 at Page ID #: 36-37, 42]. Plaintiff argues that this error affected both the physical and mental components of the RFC assessment. This argument, which rests on a false premise, can be disposed of quickly. "The Social Security Act instructs that the ALJ—not a physician—ultimately determines the claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(b)). Accordingly, there is no merit to Plaintiff's contention that the RFC should have

10

been formulated by a physician. To the extent Plaintiff argues further that the ALJ erred in his evaluation of the medical and non-medical evidence in the record, those arguments are considered below.

### 1.     Mental RFC

The ALJ found that Plaintiff was mildly limited in activities of daily living and in maintaining concentration, persistence, and pace, and moderately limited in social functioning (Tr. 11). To accommodate those limitations, the ALJ restricted Plaintiff to simple, repetitive jobs with only occasional interaction with people (Tr. 11). According to Plaintiff, however, "the evidence and opinions . . . clearly show Plaintiff is more mentally limited than found by the ALJ." [Doc. 10 at PageID #: 39].

Most of the evidence relied on by Plaintiff dates to a time period before her alleged disability began in January 2008. At the time of alleged onset, Plaintiff was being treated at Frontier Health with a GAF between 50 and 55, corresponding to moderate symptoms (Tr. 216, 226). Consistent with those GAF scores, three reviewing consultants opined in 2008 that Plaintiff had no more than moderate mental limitations (Tr. 256, 278, 288). A lone treatment note from December 2008 supports the existence of serious symptoms, with a GAF of 49, but Plaintiff admitted she had stopped taking her medications at that time (Tr. 282, 341). Plaintiff's own testimony about her limitations, to be sure, could support her allegations of disability (*see* Tr. 30), but the ALJ did not find her testimony to be credible because she had no significant medical treatment during the time period at issue[7] and because she had a history of non-compliance with her medications (Tr. 12-13).

---

[7] As the ALJ pointed out, Plaintiff testified at the hearing she was not receiving any mental health treatment, either counseling or medication (Tr. 12, 23-24).

11

Plaintiff has not challenged that credibility finding, which I **FIND** to be supported by the record.

With evidence of mild to moderate mental limitations supporting the ALJ's findings, and no credible evidence to the contrary, I **FIND** the ALJ's mental RFC assessment was supported by substantial evidence in light of the record as a whole. Plaintiff faults the ALJ's opinion because it does not explicitly mention the 2006 opinion of Dr. Lawhon or the 2008 opinions of the reviewing consultants, but Plaintiff identifies no authority requiring the ALJ to discuss the opinions of non-treating physicians in his written opinion. The ALJ noted he had "considered the opinion evidence in accordance with [the applicable regulations]," and he crafted an RFC assessment that was largely consistent with the mild to moderate limitations offered in each of those opinions (*see* Tr. 213-14, 256, 278, 288). Accordingly, there is no reason to suspect that the ALJ failed to consider the opinion evidence as required. Furthermore, and for the same reason, any error in failing to mention those opinions would be harmless. *Cf. Wilson v. Comm'r of Soc. Sec.*, 348 F.3d 541, 547 (6th Cir. 2004) (error in failing to mention a treating physician's opinion would be *de minimis* if the ALJ's RFC was consistent with that opinion).

### 2. Physical RFC

As noted above, the ALJ found that Plaintiff was able to perform the exertional requirements of medium work, which involves lifting no more than 50 pounds, and no more than 25 pounds frequently (Tr. 11). 20 C.F.R. § 404.1567(c). Plaintiff claims this finding was not supported by substantial evidence. However, a person who can perform medium work is also able to perform light and sedentary work, *id.*, and the VE testified that there were still jobs available for Plaintiff at the light and sedentary levels. Accordingly, even if the ALJ erred in finding that Plaintiff could perform medium work, the error would be harmless unless the record is inconclusive with respect

12

to whether Plaintiff could perform *at least* sedentary work. *See Rabbers*, 582 F.3d at 657 (error cannot be excused where the record contains "conflicting or inconclusive evidence" that should have been resolved by the ALJ).

Plaintiff contends that the ALJ fashioned her physical RFC out of whole cloth. She argues that "the ALJ is simply not qualified to make a medical judgment as to the effects Plaintiff's severe physical impairments would have on her ability to work." [Doc. 10 at PageID #: 42]. Of course, the ALJ does not impermissibly play doctor merely "by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 42 F. App'x 149, 157 (6th Cir. 2009). Nonetheless, Plaintiff argues that the medical evidence in this case was simply inadequate to support the RFC finding. Essentially, Plaintiff argues that there is not substantial evidence to support *any* specific RFC assessment. One might think that such a lack of evidence would result in defeat for Plaintiff, who bears the burden to present evidence showing the extent of her impairments. *See Walters*, 127 F.3d at 529. According to Plaintiff, however, the ALJ should have ordered a consultative examination or sought the advice of a medical expert to further develop the medical evidence.

Plaintiff relies on an unpublished case, *Prozondek v. Sec'y of Health & Human Servs.*, 1993 WL 15135, *2 (6th Cir. 1993) (Table), for the proposition that an ALJ may not base an RFC finding on an "inadequate" record. That unexceptional proposition, however, merely restates the Court's obligation to ensure that the ALJ's findings are supported by substantial evidence. *See id.* at *2. In *Prozondek*, the ALJ's findings were not supported by substantial evidence because there was no opinion evidence regarding the claimant's RFC and no direct evidence of the claimant's exertional abilities. Here, in contrast, the record contained a reviewing consultant's opinion that Plaintiff's

13

physical impairments were not "severe"—i.e., that they caused no significant work related limitations—and a consultative examiner's report containing direct evidence that Plaintiff's physical abilities were not as limited as she alleged. The ALJ explicitly relied on this direct evidence from the consultative examination, noting that Plaintiff's gait and station were normal and that Plaintiff had no difficulty getting on and off the examination table without help (Tr. 12). The ALJ did not specifically mention the reviewing consultant's opinion, but as explained above, there was no requirement that he do so.

Plaintiff also relies on *Manzo-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996), to argue that an ALJ is required to consult with a medical expert in cases where the record contains no opinion evidence regarding the claimant's functional capacity. *Manzo-Pizarro*, however, acknowledges that "where the medical evidence shows relatively little physical impairment, the ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Id.* Such is the case here. Plaintiff did not produce any evidence whatsoever, save for her own discredited testimony, that she suffered from any significant physical limitations. The ALJ, therefore, could have properly adopted the reviewing consultant's opinion that her impairments were not severe. The ALJ did not adopt the reviewing consultant's opinion, but instead gave Plaintiff the benefit of the doubt by limiting her to medium work. I **FIND** no error in this commonsense assessment of Plaintiff's functional capacity. As the Commissioner argues, the ALJ has the discretion to determine whether additional evidence is necessary to evaluate a claim. 20 C.F.R. §§ 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled . . . , we *may* ask you to have one or more physical or mental examinations.") (emphasis added); 416.927(f)(2)(iii)

14

Case 2:10-cv-00121-HSM-SKL   Document 15   Filed 07/22/11   Page 14 of 15   PageID #: 77

(ALJs "*may* also ask for and consider opinions from medical experts") (emphasis added); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). It was not an abuse of this discretion to decline to order additional testing because there was no reason to believe testing would reveal any significant physical limitations. *See Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *11 (N.D. Ohio 2011). Furthermore, because there is no evidence in the record that Plaintiff could not perform at least sedentary work, any error in the RFC assessment would be harmless.

## V. CONCLUSION

Based on the foregoing, I **FIND** that the ALJ's RFC assessment was based on substantial evidence in light of the record as a whole, which contains little to no evidence supporting Plaintiff's allegations of disability. Even if the ALJ had erred as Plaintiff argues, I **FIND** any error would have been harmless. Accordingly, I **RECOMMEND:**[8]

(1) Plaintiff's motion for summary judgment [Doc. 9] be **DENIED**;

(2) Commissioner's motion for summary judgment [Doc. 13] be **GRANTED**;

(3) Commissioner's decision denying benefits be **AFFIRMED;** and

(4) This action be **DISMISSED WITH PREJUDICE**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).